Our third case this morning is Rainey v. Berryhill.  Morning, Your Honors. May it please the Court. My name is Sean Goode and I represent the plaintiff, Sammie Rainey. Mr. Rainey worked his whole life and was never homeless until he had the second stroke. The 11 years leading up to the hearing, he drove the 52A street bus for the Chicago Transit Authority. This case boils down to the ALJ's unsupported findings that the claimant does not need a cane. Rainey's treating doctor confirmed he needed a cane. The ME confirmed he needed a cane. The medical evidence overwhelmingly supports Mr. Rainey needs a cane, not for pain but for balance and weakness. Even the lay person at the Social Security office who took his application noted that he had difficulty walking and standing and used a cane. Nevertheless, the ALJ seemed determined to find there was no need for a cane and latched onto irrelevant facts to deny his claim. The avalanche of errors all leads back to the flawed conclusion regarding the cane and the ALJ comes up with an RFC out of the Consultative Examiner's Report that says he can walk 50 feet unassisted. Walking 50 feet unassisted is not an RFC and does not translate to light work. The first error that's most glaring the ALJ made was not properly applying the treating physician rule and assigning great weight to Dr. Hugh Savage who testified at hearing and could not agree with himself. Mr. Goode, how much contact did Mr. Rainey have with Dr. Rosenstein, the treating doctor, over the years? Well, I think it was at the hospital. In 2011? Yes, and then again a couple days after that and then he became homeless and I think he saw him one more time again. Okay, that was in the 2014? Yes, Your Honor. Okay. When someone is homeless, what's he do? He was sitting at friends and family's houses watching TV and that's it. I mean, that's what he described at that hearing. Was there any other effort to find any alternative work or something? He said that he went back to the CTA and they actually... He's not going to drive a bus. Oh, yeah, but he worked there for 11 years so he thought they'd give him another job and they said there's no work for him. I don't remember anything specific other than that in the testimony, but he described why he couldn't do other jobs and it's due to the weakness in his hands. He's a high school educated individual. His past work was misdefined by the vocational expert, but he was a switchboard operator and he's 60, so he didn't have computer skills and there's not much work he could do. So his past skills were obsolete, is that what he's saying? Yes, I believe so, and the vocational expert mistestified about what he did in his past work. And his ability to learn keyboarding skills is impaired by the right hand weakness? He says that at hearing and then the medical expert, Hugh Savage, acknowledges that there's weakness in his right hand but does not give any limitations when prompted by counsel at hearing. Like Bjornson v. Astor, the ALJ... Mr. Goode, can I just ask you, it's frankly pretty unusual that we see disability cases with folks of this age. Can you explain to me, and I'll ask government counsel as well, where this case fits in with respect to the so-called grids? Yeah. The reason that he didn't grid disability is because the V.E. improperly classified his job as a switchboard operator as a receptionist. So there's 13,000 jobs in the DOT and there's 13 receptionist jobs. Two of them are light, 11 of them are sedentary. And the V.E. testifies, he refers to it as a sedentary job, then a light job, and then a sedentary job. And I believe hearing counsel thought it was the light one that he did, even though it was a switchboard operator, which is defined. So counsel thought he won the case. On the grids, because at his age, just so that we're clear, at his age, if he's limited to sedentary work, he counts as disabled. No, it's at his age under 202.04, if he is at light with a cane, he would be, yeah, it would be sedentary. Yes. And the cane would eliminate light work. So the misclassification by the V.E. led, along with the cane, leads this to being an erroneous conclusion. Dr. Rana reported that he was able to hop on one foot. Is that right? There were some findings by Dr. Rana that he said he could hop on one foot, tandem walk, heel-toe walk, and it appeared, based on Hugh Savage, the medical expert's testimony, that he seemed pretty surprised by these findings, considering when he walked in the room, when Hugh Savage first questioned Mr. Rainey, he says, I noticed that you're quite dependent on the cane when you walked in, and I noticed that it appears to be necessary almost, and then the judge cuts him off. And that's one of eight times the judge doesn't let the doctor testify. Which doctor was that? The medical expert, Hugh Savage. He cuts him off eight times. And that one I'm referring to is on page 76 of the administrative record. With this cane, there's a debate whether it's for balance or take weight off of a limb, whatever a cane is. And this seems to be somewhat of a debate here about the need for the cane and what he does with it. Yeah. The judge, the administrative law judge, focuses on pain, but it's really for weakness and balance. And Hugh Savage saw it at hearing, but then changed his testimony and said he doesn't need the cane. And he also didn't have all the medical records. Hugh Savage states at hearing that he only had up to 13F at home. 14F was duplicative. He didn't have 15 or 16F until hearing counsel prompted him, what records did you review? And he said, now I have up to 16F, and I had 13F at home. He didn't have 17, 18, or 19F, which one of them is a prescription for a cane. And I understand that there is a note about discharge that a box is checked that says he's walking independently. But everywhere he goes, he has this cane. And even when he goes to the CE, he has the cane. And all the CE says is he can walk more than 50 feet unassisted. That's not an RFC. Was it Dr. Rosenstein that prescribed the cane? Yes, Your Honor. Thank you. So if V.E. James Radke classified Mr. Rainey's past relevant work right and the ALJ concluded properly that he needed a cane, he would have been found disabled. And just to highlight a few of the inconsistencies in Mr. Radke's testimony, the vocational expert is he cites the receptionist job, gives three different DOT codes, two for merchandising representative, one for merchandising representative, two for a survey worker. And it's not the codes that is wrong. It's the fact that at one time he says it's light, and the other two he says it's sedentary. And the way Mr. Rainey described his job was a light job. He did do installation work. He would walk around the hospital and install phones. And the judge confused him when he said he asked this question twice in two ways. The first time he said, did you install anything? And he said, yes, I walked around the hospital and installed phones. The second time he said, did you do any technical installation? And he said, no. And I think the claimant was thinking that he didn't go outside the building and run any wires. He didn't do any splicing. He didn't do any crimping or cutting or putting between the walls. So I think I'd like to reserve the rest of my time for rebuttal. If there are no further questions. Thank you. Ms. Hahn. May it please the Court. Lou Hahn on behalf of the Commissioner of Social Security. This case involves two issues, the first being whether Mr. Rainey needed a cane, and then the second being the vocational expert's testimony about Mr. Rainey's past work. I wanted to begin, actually, with Your Honor's question about the grid rules first, because you had indicated that you wanted government counsel to cover that aspect. Thank you. As we said in our brief, that's actually not applicable in this case because this is a step four case. This case did not proceed to all five steps of the sequential evaluation process because the ALJ, with the help of the vocational expert testimony, found that Mr. Rainey could go back to one of his past relevant jobs. And it's for that reason that this case didn't get to the medical vocational grids, because this case then does not involve other jobs in the regional or national economy that Mr. Rainey could go do despite his impairments. With step five or four, I mean, is one of the jobs a receptionist? Is that correct? Yes, Your Honor, and that's the job that the vocational expert, Mr. Radke, had identified as the job description for the switchboard operator job that Mr. Rainey had at a hospital. He had that job up until 1999 or 2000. There's actually a little bit of confusion as to when he last held that job. But that receptionist job is how the vocational expert classified it. And as Mr. Rainey's counsel would have the court believe, it's that classification that somehow then creates a reversible error and makes this case need to go back for further consideration. But the vocational expert took an RFC from the ALJ, and that RFC included additional postural limitations, a limitation of not walking on uneven surfaces, because the ALJ actually gave Mr. Rainey some credit with regard to balance issues. And it was an RFC for light work with additional limitations. The vocational expert took that RFC and compared it to the types of jobs that Mr. Rainey had held, which included bus driving, and he was unable to go back to work for the CTA, which is a job he had held for about 11 years. But he had also had this job at the hospital. The vocational expert called it a receptionist job. The vocational expert gave a DOT number. And it's through that testimony that the ALJ then, in his decision, found that there's at least something from Mr. Rainey's past that he could return to. There's nothing, as Your Honor, Judge Sykes had mentioned, to indicate that a job that Mr. Rainey in the past had learned in 30 days or less, which involved a console, a keyboard, a large AT&T system, even if, for some reason, all of those systems are no longer in place and he would have to learn something new, there's no indication based on this medical record that Mr. Rainey somehow couldn't still learn, in under 30 days, a new system and a job of telephone operator. I'm not going to ask you who is going to hire a homeless man in his 60s to operate a sophisticated piece of communications equipment. What I want to ask you is how one builds a logical bridge between the medical examiner's finding that he was able to walk, quote, more than 50 feet without a cane to a residual functional capacity that he's able to stand and walk for six hours out of an eight-hour day. Yes, Your Honor. The medical examiner is the consultative examiner, Dr. Rana, I believe. I believe that was in April 2012. Dr. Rana examined Mr. Rainey and found, as Your Honor pointed out, a lot of ability with regard to hopping, squatting, getting on and off the exam table, no problems heel-toe walking. And it's actually Dr. Rana's finding that he could walk more than 50 feet with no assistive device, no need for a cane. And that is an examination after which Dr. Rana also made really a medical opinion finding, which is no difficulty sitting, standing, walking. So those kinds of exertional limitations and functionalities, Dr. Rana found no difficulty. I've got to say, given the rest of the evidence, that sounds highly improbable. Respectfully, Your Honor, not exactly. The rest of the evidence is a stroke incident in 2009, two years later a stroke incident in 2011, after which there's no records of any long-lasting neurological deficits. When Mr. Rainey went to visit Dr. Rosenstein, who was the attending at the emergency room, visited him in the month that he had the September of 2011 stroke, and then again in January 2011, at those two times he didn't report any instability. He actually didn't, Dr. Rosenstein didn't note any difficulty walking at that time. Around the end of 2011 to 2012, Dr. Rosenstein's notes were all about this blurred vision and vision impairment, and that's the reason why, in February 2012, Mr. Rainey went to see an ophthalmologist. That's important because there was one opinion from Dr. Rosenstein from 2012, which said Mr. Rainey can't work because of blurred vision. That was directly contradicted by the ophthalmologist, Dr. Sidrus, who said his vision is 20-20 with corrective lenses. The record up through the end of 2012, even including when he established care with the primary care physician, Sophia Chin, Dr. Chin managed his medications, hypertension, high blood pressure. Dr. Chin also noted that Mr. Rainey had normal gait. She noted that he came to those two visits that he had with her in October and November 2012 with a cane, but, again, that wasn't she never said he needs to continue to use the cane, or she didn't note in those notes that he had walking problems. So, Your Honor, the substantial evidence standard, we hardly ever have a case where all of the evidence is unfavorable or all of it is favorable. At this point, when we are before you, we almost always have a record that's mixed, and it's in weighing all of that evidence that was the role of the ALJ. Would you agree that Mr. Rainey had a good long-term record of steady work before the stroke in 2011? Does that count in his favor for credibility purposes? That is one of the credibility factors, yes, Your Honor. Did the ALJ consider that? It's clear that the ALJ knew about the work history because the ALJ talked about his years at the hospital and at the CTA. Is there any indication the ALJ took it into account in evaluating his credibility about the need for the cane and his ability to return to work somewhere? The ALJ didn't, in one phrasing, link work history to cane use. The cane use was really about his balance issues because, as Mr. Rainey's representative said, both at the administrative hearing and here today, this case is not about pain. It's really about steadiness and balance. The ALJ talked about ability to stand and walk for six hours a day, right? Correct, and, Your Honor, the job that the ALJ found he could go back to wouldn't involve standing for up to six hours a day. Even though the RFC, Your Honor is correct, included up to six hours of walking and standing and up to six hours of sitting, Mr. Rainey had every opportunity to describe what he did when he worked at the hospital switchboard. Mr. Rainey was asked both by the ALJ and by his attorney at the hearing, and he described it as, for the most part, sitting. It was, as the vocational expert testified, and this gets back to kind of another mistake, as Mr. Rainey would have it be classified, but really it was not an error. The vocational expert said, as performed by Mr. Rainey, the job that he did at the hospital was sedentary. He didn't do a great deal of walking. As described in the DOT, that job was light. So the regs really have at step four the ability to say, have the decision maker find that someone can go back to his or her past job either as they actually performed it or as it's performed in the national economy. When you're reaching back, how many years? Fifteen, Your Honor. Well, in this case we'd be saying more than 15 years. The theory for denial is that he should return to that job from 15 years ago using equipment that's probably several generations obsolete. Does that bear any link to reality? Respectfully, Your Honor, we're not reaching past the 15 years. That's not something Mr. Rainey has even alleged because that's not true. The hearing, which was in 2014, the ALJ's decision was in 2014. It's 2018 now, and the theory that is being used to support this denial of a guy who's worked his whole life is that he should return to this obsolete job, right? We have no indication that the job in taking calls for hospitals is necessarily obsolete, so respectfully, Your Honor, we're not prepared to concede that the job itself is obsolete. But we understand your point, which is today is 2018. We are looking, though, however, at a 2014 ALJ decision, and unless the regs change, the interpretation has always been 15 years from that time. He applied for benefits in 2011, went through the administrative process, and had a hearing in 2014. This is not actually—we have cases often where claimant's cases do bounce back and forth for many, many years, if not decades, in the administrative process into the courts, but we don't necessarily have that here, and those weights are an unfortunate function of the backlog. The timing of this job falls within a proper past relevant work. It's never something that Mr. Rainey has contested that it was inappropriately included as a past job. His problem is really that he has these additional limitations, which were not supported by the record that he had ample opportunity to provide. And the fact that the medical expert, Hugh Savage, didn't see Exhibits 17F and 18F, also not exactly as Mr. Rainey would have us believe is so problematic, it's because those pieces of evidence were included in the record after the hearing, after Dr. Savage testified, so there would have been no way for him to see those additional exhibits in the record. But the ALJ considered all of the relevant evidence in making his decision, and I see that my time has expired, if I could conclude. We ask that this court affirm the district court's decision, which upheld the ALJ's decision that Mr. Rainey did not satisfy the test for disability under the Act. Well, he wouldn't be expected to go back to a job that he could describe a job that he could do, except those jobs don't exist anymore. That's sort of the impression I get here, that there's things he could do that would be productive if there was such a job. But there aren't any. I mean, a receptionist is a very vague term. Some places it could be a greeter at Walmart, and in other places it could be a very important person who determines everybody who comes in the door and determines who they get to see and don't get to see, et cetera. So it's a pretty wide range of possibilities. And I absolutely understand Your Honor's point, and I would turn the panel to a citation we have in our briefing, which is to the Regulation 20 CFR 404.1566, which talks about technological changes and that if someone is unable to reenter the workforce because of a shift in technology, that's not really under the scheme that we have and that we're working under. That's not the test to say that someone's entitled to disability benefits. Does that happen? It very well may be happening in many industries. But, again, the regs have contemplated that and, in fact, have said that's not alone reason enough to find someone disabled. Nobody's suggesting that alone is reason enough to find him disabled. He had a stroke, had to leave his job. Even CTA couldn't find a position for him. Thank you. Thank you. Mr. Goode, anything further? Sure. The commissioner is correct. We don't know what job the ALJ thought he could do because if you read this decision, he doesn't cite a DOT code, which is pretty surprising to me. I read a lot of decisions by ALJs. I've never seen one with no DOT code cited. And the vocational expert says twice that it's a sedentary job and once that it's a light job, even though it's misclassified. So, you know, under Overman, I think the judge should have picked up on this. And, you know, I don't want to – it seems implied that he knew this by not including it in the decision. The ALJ did give some limitations regarding balance. And what's interesting is those limitations are directly out of a listing, a disabled listing that would stop the case at one point of – at step three. And I believe it's listing 1.02, and it talks about uneven surfaces. It's the listing for inability to ambulate effectively. And he didn't meet it perfectly, but it's interesting that he gives limitations directly out of a listing that would meet his disability. I can't – you know, I'm not here to testify, so I can't tell you what jobs are available and if the switchboard operator exists. But he discussed using AT&T consoles to route calls and connect phones. The world has gone to voice over IP. Even my grandma, they ripped it out of her hands, sadly. She's very sad about it. She's not the only one. And with the vision impairments, you know, stability or improvement should hold little weight here. I think, you know, when the doctor said he should be off because of – the doctor was concerned he's driving a multi-ton bus. When someone tells you they're losing their vision, you don't want them driving a bus or, you know, especially a big CT. Right. The ALJ didn't suggest that that was within the realm of possibility. Yeah. So with that, we respectfully request a reversal of this decision. Thank you, Your Honor. All right. Thank you. Our thanks to both counsel. The case is taken under advisement.